## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| HECTOR G. BELTRE, JR., | : | |
| | : | |
| Plaintiff, | : | No. 3:18-CV-1117 (VLB) |
| | : | |
| v. | : | |
| | : | September 9, 2019 |
| COMMISSIONER OF SOCIAL | : | |
| SECURITY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## MEMORANDUM OF DECISION DENYING
## MOTION TO REVERSE THE DECISION OF THE COMMISSIONER [ECF NO. 19]

Before this Court is an administrative appeal filed by Plaintiff Hector G. Beltre, Jr. ("Claimant") pursuant to 42 U.S.C. § 405(g) following the denial of his application for Title II Social Security Disability and Title XVI Supplemental Security Income benefits.[1]  Claimant moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner") and remanding the case pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) on the basis that ALJ Alexander Peter Borré gave too much weight to the evidence of Claimant's substance abuse, which, in the face of Claimant's undisputed disability, caused the

---

[1] Under the Social Security Act, the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. § 405(b)(1). The Commissioner's authority to make such findings and decisions is delegated to administrative law judges ("ALJs"). 20 C.F.R. §§ 404.929 *et seq.* Claimants can in turn appeal an ALJ's decision to the Social Security Appeals Council. 20 C.F.R. §§ 404.967 *et seq.* If the appeals council declines review or affirms the ALJ opinion, the claimant may appeal to the United States District Court. Section 205(g) of the Social Security Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

ALJ to improperly deny Claimant disability benefits.[2] *See* [ECF No. 19 (Mot. to Reverse the Decision of the Comm'r)]. The Commissioner opposes this motion. [ECF No. 25 (Mem. in Supp. of Mot. to Affirm the Decision of the Comm'r)]. For the foregoing reasons, Claimant's motion is DENIED and Commissioner's Motion for an Order Affirming the Commissioner's Decision is GRANTED.

## I.    Background

Only the Commissioner has filed a Statement of Material Facts in this case.[3] The Commissioner's Statement of Material Facts accurately reflects the record and is incorporated into this opinion. The following facts derive from the Commissioner's Statement of Material Facts and the record.

Claimant was born on March 29, 1981 and alleges his disability began on March 25, 2011 when he was 29 years old. (R. 407). On September 15, 2014, Claimant applied for SSDI and SSI benefits. (R. 10). At the time of the hearings[4] on September 26, 2017, and January 23, 2108, Claimant lived with his parents in Manchester, Connecticut. (R. 88, 90, [ECF No. 1 at 6]).

---

[2] The Court's Scheduling Order, [ECF No. 17], set the deadline for Claimant's Motion to Reverse/Remand on November 10, 2018. Claimant did not so file, which led the Court to issue an Order to Show Cause on December 14, 2018, [ECF No. 18], requiring Claimant to file his Motion to Reverse/Remand by December 21, 2018. Claimant's *pro se* handwritten Motion to Reverse/Remand was filed on March 18, 2019, [ECF No. 19], as a Motion for Reconsideration, which the Court has accepted as a Motion to Reverse/Remand. *See* [ECF No. 22].

[3] The Commissioner moved to exceed the 20-page limit for the Statement of Material Facts by nine pages, both due to the extensive administrative record in this case "and because Defendant is mindful of Plaintiff's pro se status and wishes to err on the side of inclusivity." [ECF No. 23]. The Commissioner attempted to contact Claimant regarding the motion but was unsuccessful. *Id.* The Court granted this motion, despite being unsure about Claimant's position on the Commissioner's motion. [ECF No. 24].

[4] At both hearings Claimant was represented by counsel, but he filed his Complaint and Motion to Reverse/Remand the Commissioner's Decision *pro se.*

## A.     Medical History

Claimant received psychotherapy and psychiatric treatment from Dr. Jose Santos at the Connecticut Anxiety and Depression Treatment Center ("CADTC") from February 18, 2010 through August 2010. (R. 676-96). On intake on February 18, 2010 he reported anxiety and depression and reported marijuana use. (R. 685, 687).

On June 11, 2010, Claimant was referred to admission in a "professional program" at the Institute of Living ("IOL"), which is part of the Hartford Hospital Mental Health Network, by his outpatient psychiatrist for increased depression and anxiety, isolating, risky sexual behavior, feelings of guilt and worthlessness, poor concentration, passive suicidal thoughts, and feelings of hopelessness. (R. 666). His last day in the program was July 16, 2010. *Id.* Dr. Alfred Herzog, a supervising psychiatrist, summarized Claimant's treatment in the program in a treatment note dated July 22, 2010. (R. 666-68). Dr. Herzog wrote that Claimant had a history of alcohol abuse from age 22 through 25. (R. 666). He reported smoking cannabis since age 17, five days a week, and then having a period of not using it. *Id.* He used cocaine at that time twice a month. *Id.* Dr. Herzog stated that Claimant minimized his substance use problems but agreed to abstain for the sake of the program. *Id.* During the first two weeks in the program, Plaintiff reported improvement, feeling less depressed and more hopeful, but by the third week, he regressed. *Id.* He reported that his work place, from which he was on a leave of absence, did not appreciate him, but the vocational counselor had heard from his work place that they very much valued his work. (R. 666-67). Two urine drug screens during his time in the program were positive for cannabis and negative for

3

cocaine. (R. 667) Claimant admitted he had smoked marijuana occasionally while in the program, but less than he had previously. *Id.* He was diagnosed with bipolar disorder, cannabis dependence, cocaine abuse, history of alcohol abuse, asthma, and gastroesophageal reflux disease (GERD). (R. 668). During his treatment, he took lithium, which was ultimately discontinued, as well as Depakote and Klonopin, which were continued at discharge. (R. 667). He was also prescribed Wellbutrin, Lexapro, and omeprazole (an anti-acid medication used to treat GERD) at discharge. *Id.* His condition on discharge was listed as: "Regressed, worsening of symptoms." (R. 668).

On July 16, 2010, Claimant was admitted voluntarily from the IOL professional day treatment program to in-patient care because he had been "feeling increasingly depressed, increasingly anxious, and [had] suicidal ideation." (R. 670). Social worker Joette Johnson provided a discharge note summarizing Claimant's in-patient treatment at the IOL from July 16 through July 21. (R. 670-73); *see also* (R. 674). She noted that by the time of discharge, Claimant "exhibited an appropriate affect" and "was hopeful regarding the future." (R. 672). "He denied suicidal ideation," was "cooperative" and "goal-directed," and "reported positive effects [from his] medications. *Id.* On discharge, he was given a post-hospital treatment plan, advised to avoid alcohol and illicit substances, and was assigned to the IOL dialectical behavioral therapy (DBT) program with a start date of July 23, 2010. (R. 672-75).

Claimant tested positive for HIV in February 2011. (R. 699). His primary care physician, Dr. Kenneth Abriola, gave him the results on March 2, 2011. (R. 735).

Dr. Abriola increased Claimant's Lexapro dose to 30mg and encouraged him to see his therapist. (R. 736). Claimant denied suicidal ideation. *Id.*

On March 29, 2011, Claimant told Dr. Abriola he was off his medications due to not having health insurance. (R. 733). He was "alert," "oriented," and "pleasant," and his physical examination results were normal. *Id.* Dr. Abriola discussed starting antiretroviral therapy and "strongly encouraged" Claimant "to remain on his psychiatric medications." (R. 734).

Claimant saw Dr. Abriola again and reported an improved mood and improved energy on April 27, 2011 and stated that he had been taking his medications. (R. 731). He was alert, oriented, and pleasant, and a physical examination was normal. (R. 731-32). He returned on May 13 to discuss his HIV care plan. (R. 867). Examination results remained the same. (R. 867).

Dr. Abriola provided a medical opinion dated June 8, 2011 regarding Claimant's mental functioning. (R. 744-46). He indicated that he had seen Claimant every two to three months and as needed since March 2009, and that Claimant had slightly improved during this time. (R. 744). Dr. Abriola indicated that Claimant had diagnoses of bipolar disorder and moderate depression. *Id.* He took Lexapro 20 mg daily, Wellbutrin 300 mg daily, and Clonazepam 1 mg three times daily. *Id.* Dr. Abriola stated that Claimant was in "no acute distress," his speech was "normal," he had no hallucinations or delusions, and his decision-making was "moderately impaired." (R. 744-45). He indicated that Claimant was depressed and anxious. (R. 745). Dr. Abriola opined that Claimant had a slight problem asking questions or requesting assistance, getting along with others without distracting

them or exhibiting behavioral extremes, and carrying out multi-step instructions. (R. 746). He opined that Claimant had an obvious problem using appropriate coping skills to meet the ordinary demands of a work environment, handling frustration appropriately, interacting appropriately with others in a work environment, focusing long enough to complete tasks, changing from one simple task to another, and performing basic work activities at a reasonable pace. (R. 745-46). He further opined that Claimant had a serious problem performing work activity on a sustained basis. (R. 746). He opined that Claimant had no problems in other areas of work activity. (R. 745-46).

Dr. Abriola also provided an opinion dated June 8, 2011 regarding Claimant's physical impairments due to HIV. (R. 748-49). He reported that Claimant could perform daily life activities and was responding to HIV treatment but had "[d]ifficulties with participating in large group activities." (R. 749).

On June 10, 2011, Claimant was tearful and anxious when he saw Dr. Abriola. (R. 727). He reported taking Klonopin regularly but was only taking 10 mg of Lexapro per day. *Id.* He was alert, oriented, and pleasant. *Id.* Dr. Abriola encouraged him to increase his daily dose of Lexapro to 30mg, as previously instructed. (R. 728). His HIV infection continued to be asymptomatic. *Id.*

David Schroeder, Ph.D., who indicated he had been treating Claimant since February 24, 2010, provided an opinion regarding Claimant's mental functioning on June 30, 2011. (R. 752-55). He reported that Claimant had "racing thoughts" and reduced memory and concentration, but that he was fully oriented. (R. 752). His mood was depressed, and his affect was flat, but his insight and judgment were

good. (R. 753). Dr. Schroeder opined that Claimant had from obvious to serious problems in activities of daily living. *Id*. He opined that Claimant had no problems getting along with others without distracting them or exhibiting behavioral extremes, slight problems asking questions and responding appropriately to others in authority, and an obvious problem interacting appropriately with others in a work environment. (R. 754). He further opined that Claimant had no problems carrying out single-step instructions, focusing long enough to finish assigned tasks and activities, and changing from one simple task to another; a slight problem carrying out multi-step instructions; an obvious problem performing basic work activities at a reasonable pace; and a serious problem performing work activity on a sustained basis. (R. 754). Dr. Schroder also submitted therapy notes dating from February 2010 through June 2011, which reflect notations from an initial session on February 24, 2010 discussing Claimant's history of anxiety and depression, and several sessions from March through June 2011. (R. 756-64).

On July 21, 2011, Claimant returned to Dr. Abriola. (R. 774). A physical examination was normal, and he was alert, oriented, and pleasant. *Id*. Claimant's mental health appeared to be stable, and Dr. Abriola noted that he would have to address the issue of activating prescriptions from providers that Claimant was no longer seeing. (R. 775).

Claimant was admitted to the IOL on September 7, 2011 with suicidal thoughts, noting stressors including his HIV diagnosis and having to live with his parents because he had lost his job. (R. 803). He had stopped mental health treatment after losing his job because he no longer had insurance. *Id*. On intake

Amy Taylor, M.D., a psychiatrist, noted Claimant's prior diagnoses of bipolar disorder, cannabis dependence, and cocaine dependence, and noted that prior to admission Claimant had been using marijuana and crack cocaine daily after relapsing two months prior. (R. 803, 806). His admittance drug test was positive for benzodiazepines, cocaine, opiates, and marijuana. (R. 803). During his hospital admission, his medication was switched from Lexapro to Celexa because Celexa was on the hospital formulary, and he was also prescribed Haldol 5mg twice a day and Cogentin 0.5 mg twice a day. *Id.* He stabilized fairly quickly and reported that his mood was good. *Id.* He was discharged on September 9, 2011, at which time he denied suicidal or homicidal ideation, and reported feeling calmer with his medication adjustments. *Id.* Dr. Taylor noted that this depressive episode was most likely related to substance dependence and stated that "the reason he [was] feeling better [was] that he [was] no longer using crack" cocaine. *Id.* He had a fair response to treatment with therapy, coping skills groups, and medication management. (R. 807). He was encouraged to abstain from illicit drugs in order to maintain his mood and prevent repeat episodes of depression. (R. 803).

Claimant had an intake assessment with social worker Heidi Friedland on September 14, 2011. (R. 833). He admitted that prior to his inpatient treatment at the IOL with Dr. Taylor he was using marijuana almost daily and was using $25-$50 worth of cocaine daily, and that his drug use had increased since February 2011. (R. 837-38). Claimant said he did not believe he had this substance abuse problem anymore. (R. 838). Mental status examination results indicated that Claimant was well-groomed and cooperative, with good eye contact. *Id.* His speech was normal

but pressured, and his thought process was intact. *Id.* He was fully oriented, and his memory, judgment, and insight were intact (though it was also noted that his memory was questionable because some of his reporting contradicted information in his medical records). (R. 838, 841). He expressed suicidal ideation, but no plan. (R. 839). His mood was depressed and anxious. (R. 841).

Claimant returned to Dr. Abriola on September 28, 2011. (R. 875). His family said he had been behaving oddly, but he had no memory of his behaviors. *Id.* He was disgusted with himself and had thrown out all of his medication. *Id.* He was alert, oriented, and pleasant, with pressured speech and intermittent tearfulness and agitation. *Id.*

On November 10, 2011, Dr. Abriola again noted that Plaintiff's HIV was asymptomatic and encouraged him to adhere to mental health treatment. (R. 719). He also provided an opinion on Claimant's mental impairments, stating that Claimant had normal speech, but poor concentration and difficulty focusing. (R. 821). He was depressed and anxious and his decision-making was moderately impaired. *Id.* Dr. Abriola opined that Claimant had no problem taking care of personal hygiene or caring for his physical needs, and had a slight problem using good judgment regarding safety and dangerous circumstances. *Id.* He opined that Claimant had a serious problem handling frustration appropriately and a very serious problem using coping skills to meet ordinary demands of a work environment. *Id.* He noted that Claimant had difficulty accepting that he had a mental health condition, and Dr. Abriola encouraged Claimant to adhere to a mental health treatment plan. *Id.*

Claimant saw Dr. Abriola again on December 19, 2011. (R. 879). He had not taken his psychotropic medications for a month and was not taking his HIV medication. (R. 879, 880). He was alert and oriented, but his thought process was somewhat "tangential." (R. 879). His physical examination was normal. *Id.*

On April 18, 2012, Claimant returned to Dr. Abriola for follow up HIV care. (R. 881). He continued to resist efforts to use medication for his bipolar disorder. *Id.* He was alert, oriented, and calm, and physical examination results were normal. *Id.* His HIV continued to be asymptomatic. *Id.* The following month, he reported that he was feeling better mentally and working with his therapist but wanted to stay off medications until November 2012 and was focusing on prayer. (R. 883, 885). His physical and mental status examination results continued to be normal. (R. 884-85). Blood test results showed that Claimant's CD4 count was 319, which was below the normal range of 535-1451, and Dr. Abriola noted that Claimant should clearly be back on antiviral therapy, but Claimant was reluctant to consider any medications until after November 2012. (R. 885).

Claimant saw Dr. Abriola again in October 2012. (R. 890). Mental and physical examination results remained normal. (R. 891). He asked to resume HIV treatment, so Dr. Abriola prescribed Truvada and Isentress. (R. 892). Claimant remained off medication for his depression and bipolar disorder. *Id.* In December 2012, Claimant reported to Dr. Abriola that he was working two jobs. (R. 893). Examination results remained normal. *Id.* He was still off psychotropic medications. (R. 894).

In March 2013, Claimant told Dr. Abriola he was doing well with his new job. (R. 898).  At that appointment, as well as appointments in April and November 2013, he continued to take his HIV medications and to refuse medications for depression and bipolar disorder, and his examination results remained the same.  (R. 899, 901-02, 904-05).

In March 2014, Claimant told Dr. Abriola that he had used crack cocaine that week after an episode at work.  (R. 907).  He was alert and oriented, pleasant, calm, and appropriate, and physical examinations were normal.  *Id.*  Dr. Abriola noted that Claimant remained off medication for his mood disorders, and he was concerned by Claimant's paranoid ideation and cocaine use.  (R. 908).  He cautioned Claimant against further use of cocaine.  *Id.*

Two weeks after reporting the episode of cocaine use, on March 21, 2014, Claimant told Dr. Abriola that he had been fired from work and was having chest pain related to anxiety. (R. 910).  He had, however, obtained a new job that he would be starting on April 7.  *Id.*  He stated that he had used other peoples' Xanax and would use alcohol if he could not get Xanax but denied using cocaine or crack again.  *Id.*  His mental status and physical examinations remained normal.  (R. 912).  Dr. Abriola prescribed clonazepam to treat Claimant's mood disorder but noted that historically he was not particularly adherent to his prescriptions.  *Id.*  He advised Claimant to resume treatment with his therapist. (R. 912).

Dr. Jesus Lago conducted a psychiatric assessment of Claimant for Connecticut Disability Determination Services on November 11, 2014.  (R. 934-37). Claimant was calm, cooperative, polite, and respectful.  (R. 934).  His posture and

gait were normal, and he had excellent grooming and hygiene.  *Id*.  Dr. Lago noted

that Claimant was an excellent historian.  *Id*.  Claimant reported that he had lost his

job in 2011 after it was revealed that he was HIV positive, after which he was

hospitalized for one week for depression.  *Id*.  He then had psychiatric care for 14

months.  (R. 935).  He reported that he did well with treatment and returned to work

and was doing well in his usual state of health until March 2014 (which, as other

records show, was when he began using crack cocaine).  (R. 907, 934).  He was not

taking psychotropic medications or receiving mental healthcare.  (R. 934).  He

reported being depressed for the last three to four months, and that he had been

anxious as well.  (R. 935).  He reported that he was taking HIV medications and

Klonopin.  *Id*.  He stated that he last used crack cocaine two months before and

marijuana one year before.  *Id*.  He had never been to a formal rehabilitation

program but had attended groups at his church.  *Id*.  He said he was not sure if he

would be able to work and he was tired of being harassed.  (R. 935-36).  He lived

with his parents, took care of his chores, did his activities of daily living, and

functioned independently.  (R. 936).

Dr. Lago's November 11, 2014 mental status examination showed that

Claimant was relaxed, cooperative, and pleasant, with very good rapport.  (R. 936).

His speech was normal rate, tone, and intensity, and he was coherent, logical, and

goal-directed.  *Id*.  His mood was "okay," and his affect was appropriate.  *Id*.  He

reported being depressed five to six days out of seven for the past three to four

months.  *Id*.  He reported low energy and fluctuating appetite.  *Id*.  His cognition

was excellent, he was fully oriented, and he followed simple commands and

instructions. *Id*. He was insightful, attentive, and well-focused. *Id*. Dr. Lago assessed major depressive disorder, recurrent mild-to-moderate, crack cocaine dependence in early full remission, and cannabis dependence in sustained full remission. *Id*. Dr. Lago opined that Claimant had an excellent understanding of his condition, his memory was intact, and he demonstrated sustained concentration and persistence throughout the interview. (R. 937). His social interaction with supervisors and coworkers has been excellent. *Id*. Dr. Lago opined that in the short term, Plaintiff may have difficulty adapting to work setting, but his prognosis was excellent, and that he had done very well with psychiatric care and treatment in the past. *Id*.

On January 7, 2015, Claimant had an intake assessment at CHR, a behavioral health care provider, with therapist Christine Grant. (R. 941). He reported uncontrollable anxiety and depression. *Id*. He was not working but was looking for work and had been unemployed since March 2014. *Id*. He reported that he had been feeling depression symptoms for the last year due to loss of work and the murder of his uncle. *Id*. He stated that his anxiety was manageable until November 2014. (R. 942). He stated that he had not used drugs in the last 30 days, but he that he used alcohol to help him relax and deal with depression. (R. 944). His drinking was variable from week to week, and sometimes he did not drink, but sometimes he had blackouts. *Id*. Mental status examination results were generally unremarkable, including that Claimant was fully oriented, his thought process was organized and clear, his psychomotor activity was normal, and his judgment was

intact, but his immediate recall was poor. (R. 947). It was recommended that Claimant begin individual therapy. (R. 972).

On March 5, 2015, Claimant saw Dr. Abriola, who noted that Claimant had had a manic episode and was hospitalized at Manchester Memorial Hospital (MMH), where his urine tested positive for cocaine, and he reported that he had relapsed on crack cocaine. (R. 990). Claimant was alert and oriented, with a flat affect, slow speech, and a depressed mood. (R. 991).

On March 6, 2015, Claimant saw therapist Shirley Higgins for assistance with panic attacks, anxiety, and substance abuse issues. (R. 1361). Claimant reported severe anxiety, as well as grief issues stemming from the murder of his uncle. (R. 1362).

Claimant saw Dr. Teodora Andrei on March 10, 2015. (R. 954). The treatment note indicated that Claimant had recently been to the emergency department with chest pains and was found to be manic. *Id*. Claimant told Dr. Andrei that prior to the emergency department visit, he was bingeing on cocaine for two days. *Id*. When he was discharged from the hospital, he was supposed to follow up at STEPS, but he only attended for three days because he did not tolerate going to group therapy. *Id*. He had had three sessions with Ms. Higgins. *Id*. Claimant's mood was irritated but his thought process was organized. *Id*. He stated that he had a couple of panic attacks since he was discharged from the hospital, and they "just happened." *Id*. Dr. Andrei noted that "[a]lthough he is aware of the deleterious effects of cocaine on both the physical and mental health he is not

accepting that his most recent psychiatric admission was related to his cocaine abuse." *Id.*

On March 24, 2015, Claimant told Dr. Andrei that he had not abused alcohol in over one week and had no cocaine since his most recent hospital admission. (R. 958). He was planning to take a trip to Nevada with his cousin at the end of March. *Id.* Claimant reported having run out of 30 one-half milligram tabs of lorazepam within one week, having taken more than recommended due to experiencing chest pains. *Id.* Mental status examination results were unremarkable, and Claimant stated that his anxiety had been less in the last week despite the fact that he had not been taking his lorazepam. *Id.* He reported that for the past week, he was able to calm himself down, and had decided to manage his anxiety by not taking so much medication, but rather by deep breathing and relaxation techniques. *Id.*

Claimant saw Dr. Andrei again on February 1, 2016. (R. 983). He had missed the previous month's appointment because he was working. *Id.* He was a little anxious about his new job as a case manager but had been performing well. *Id.* He reported sobriety from alcohol, cannabis, and cocaine, as well as good sleep, and appropriate energy. *Id.* He had started jogging, which he said helped with his anxiety. *Id.* Mental status examination results were normal. *Id.*

Dr. Abriola submitted a letter dated February 24, 2016 reporting that Claimant had no physical limitations that would affect his ability to do work-related activities such as sitting, standing, walking, lifting, carrying, and bending, but that his mood disorder would make it difficult for him to concentrate, remember instructions, and handle work-related pressures. (R. 986).

Claimant returned to therapy with Ms. Higgins on June 20, 2016. (R. 1362). Ms. Higgins noted that he had ended therapy in November 2015, after which he had lost his job at a leasing agency because he did not receive a promotion, and then got another job as a caretaker at a farm. Claimant stated that he liked his new job at first but lost it after he relapsed on crack cocaine and alcohol. *Id*. Claimant got another job as a case manager but felt that people were bullying him and was told to either resign or be fired. *Id*. He was frustrated with himself for losing his job and relapsing. *Id*.

Claimant was hospitalized from June 20, 2016 to June 27, 2016 at St. Francis Hospital. (R. 997, 1004). He was instructed to start weekly group counseling. (R. 1007).

Claimant began an intensive outpatient mental health treatment program (IOP) at Hartford Health Care on July 11, 2016, noting recent depression and substance abuse. (R. 1332). A discharge report indicates that he initially engaged well and participated in the program, but relapsed on crack cocaine after three weeks, and then sustained a tooth infection that required surgery, after which his attendance decreased. (R. 1334). He eventually returned to the program, but did not fully re-engage, and eventually dropped out of the IOP. *Id*.

Claimant had a CT scan with contrast of his neck on December 7, 2016 to evaluate enlarged lymph nodes that worsened after a tooth extraction in October 2016. (R. 1137). The CT scan showed Claimant's lymph nodes were enlarged, but not infected. (R. 1138). Lymphoproliferative disorder, or uncontrolled proliferation of lymph node cells, was strongly suspected. *Id*.

Claimant went to the emergency department at Manchester Memorial Hospital ("MMH") on December 13, 2016 complaining of chest pain, which was precipitated by smoking crack cocaine. (R. 1149). Claimant reported he had been bingeing on cocaine for the past couple of days and had been having problems with crack cocaine for the past several months. *Id.* He was kept overnight and discharged home in satisfactory condition. (R. 1153).

Claimant began what was supposed to be a four-day series of therapy at MMH on December 15, 2016 (R. 1131-33) after he had been drinking alcohol, smoking marijuana and smoking crack cocaine "really bad" but was terminated after one session after he failed to return to treatment. (R. 1134-36).

On December 29, 2016, Claimant's right cervical lymph node was removed. (R. 1042).

Claimant had a positron emission tomography (PET) scan on January 16, 2017 for suspected lymphoma. (R. 1139). The scan showed symptoms consistent with Hodgkin's lymphoma. *Id.* Claimant subsequently had a chemotherapy port placed in his chest on February 6, 2017 for treatment of the lymphoma. (R. 1142). Claimant tolerated the procedure well with no complications. (R. 1143).

Claimant went to the emergency department at MMH on February 11, 2017 complaining of body pain, insomnia, restlessness, shortness of breath, headache, and pain in his neck and chest. (R. 1157). He reported that he had been hiccupping and retching since beginning chemotherapy. *Id.* It was noted that Claimant had a history of smoking crack cocaine. (R. 1158). Claimant was admitted for pain management. (R. 1182). It was unclear whether Claimant's headache was an

ongoing symptom of anxiety/bipolar disease, narcotic seeking behavior, or related to his ongoing malignancies. (R. 1175). Dr. Michael Reale indicated that Claimant's pain was not explained by his lymphoma or chemotherapy. (R. 1186). Claimant felt better by the next day after receiving IV fluids and valium and he was discharged home on February 14, 2017. (R. 1193).

Claimant went to MMH on February 15, 2017 at 2:44 a.m. complaining of abdominal pain. (R. 1195-1200). An abdominal CT scan showed distended large bowel loops filled with stool, consistent with constipation. (R. 1201-02). The CT scan showed no acute inflammatory disease. (R. 1202). Claimant was diagnosed with constipation. (R. 1203). He was found to be stable for discharge but became combative and stated that they had not done anything for him and demanded medication. *Id.* Claimant refused to leave the emergency department, and the hospital called the police to remove him. *Id.*

Claimant then went to Eastern Connecticut Health Network ("ECHN") Rockville General Hospital by ambulance from jail later on February 15, 2017 with complaints of abdominal and chest pain and rectal bleeding. (R. 1014-16). He stated that his symptoms began recently after his first chemotherapy treatment for lymphoma the previous week. (R. 1015). Claimant was slightly agitated, but alert, cooperative, and coherent. *Id.* Physical examination results were normal, and an abdominal examination was benign. (R. 1016). Claimant's family told doctors they were concerned Claimant was seeking drugs. (R. 1018). He was discharged home in stable condition with instructions to follow up with his doctor. *Id.* Claimant then made suicidal statements to his family and threatened to jump out of a moving

vehicle and returned to the hospital. (R. 1022, 1029, 1033). Claimant became aggressive with the hospital staff, insisted on pain medication, and was placed in restraints after throwing a water pitcher at a nurse. (R. 1023, 1029). A urine drug screen was positive for benzodiazepines, and otherwise negative. (R. 1031-32). Claimant's sister and mother reported that they believed he had been abusing pain medications. (R. 1034).

Claimant was admitted to the Hartford Hospital's Institute for Living on February 17, 2017 and discharged the following day. (R. 1337). While there, he complained of chest pain and anxiety, reported pain at his chemotherapy port site, and threatened to pull out his port, although treatment notes indicate that there was nothing wrong with his port. (R. 1338). He had been prescribed Ativan for anxiety but was using 4-5mg per day instead of the prescribed 1-2mg per day, causing him to run out. (R. 1338). He used diazepam after his Ativan ran out, and notes indicate that this put him at high risk for benzodiazepine withdrawal. (R. 1339). It was also recommended that he be placed on an assessment for alcohol withdrawal. (R. 1337).

Claimant was admitted to Hartford Hospital on February 19, 2017 for evaluation of chest pain and anxiety. (R. 1049). It was noted that he was currently on chemotherapy for Hodgkin's lymphoma. (R. 1049, 1059). He was medically cleared and then transferred for evaluation of depression after making suicidal statements and threatening to pull out his chemotherapy port. (R. 1050). He was discharged on February 23, 2017. (R. 1052).

Claimant returned to the emergency department at Hartford Hospital on February 26, 2017 complaining of chest pain. (R. 1063). He reported that his chest pain had become more frequent since he ran out of Ativan. *Id.* Physical examination results were normal. (R. 1064-65). Dr. Adam Wise indicated that this was likely psychosomatic pain but took steps to rule out pulmonary embolism due to Claimant's recent cancer diagnosis and found no acute cardiopulmonary problems. (R. 1065, 1072). Claimant was discharged later that day with no signs or symptoms of serious physical impairments. (R. 1085-86).

From February to April 2017 Claimant underwent three rounds of chemotherapy to treat his lymphoma under the supervision of oncologist Dr. Firschein. (R. 1093-1115).

An April 24, 2017 PET scan showed that Claimant had a positive response to his lymphoma treatment, and that his cancer was in remission. (R. 1294).

When Claimant saw Dr. Firshein for follow-up on May 3, 2017, Dr. Firshein indicated that Claimant would proceed with another course of chemotherapy as part of the plan for a total of six courses. (R. 1322). He noted that Claimant was doing well. *Id.*

On May 18, 2017, Claimant saw Dr. Tilla Ruser for psychiatric medication management. (R. 1345). He reported that he had a relapse, took cocaine and opioids, and became "really suicidal." *Id.* Dr. Ruser noted that "[o]verall, [Claimant] greatly minimizes his substance use." *Id.* On mental status examination, memory, attention, and concentration were impaired. (R. 1347).

Claimant was admitted to Hartford Health Care Institute for Living on June 15, 2017 after his sister found him in his room surrounded by empty pill bottles in an apparent suicide attempt. (R. 1353, 1356). He also tested positive for cocaine. (R. 1356). He had no emergent physical conditions. (R. 1357). Claimant responded well to treatment for his depressed mood, suicidal ideation, and substance abuse. (R. 1358). By the time of his discharge on June 19, 2017 he was pleasant and cooperative, and his attention, concentration, insight, and judgment were good. (R. 1353).

On June 20, 2017, Claimant returned to Dr. Ruser for medication management. (R. 1349). Claimant reported ongoing cocaine use, which led him to feel more depressed with suicidal thoughts and to overdose on pills. *Id.* His memory, attention, and concentration were impaired. (R. 1351). Dr. Ruser noted that he was restarted on Ativan during an inpatient treatment program, despite a "severe benzodiazepine addiction," and she told Claimant that she would not prescribe him Ativan unless he would accept daily nursing visits in his home. (R. 1349).

Claimant had in-home psychiatric nursing care from June 23, 2017 to June 30, 2017 to assist with medication compliance. (R. 1224-25, 1226-70). He had recently overdosed on Ativan and Trazodone after a cocaine binge, after which he became increasingly depressed and psychotic. (R. 1227). It was noted that his psychosis was likely exacerbated by illicit drug use. (R. 1228). He reported that he smoked and snorted cocaine and drank a moderate amount of alcohol. *Id.* Nurse Nancy Ralph wrote in progress notes from June 23 that she requested to do a

physical therapy/occupational therapy evaluation, which was suggested due to Claimant's complaints of fatigue and generalized body aches after chemotherapy, but Claimant declined and said he did not feel he needed it. (R. 1227). Nurse Ralph noted that Claimant had no functional limitations or muscle strength limitations, and that a musculoskeletal evaluation was within normal limits. (R. 1233).

Claimant began psychotherapy with social worker Ursula Chock-Harris on July 17, 2017. (R. 1297). Ms. Harris noted that Claimant had been clean for one month following a relapse in June. (R. 1297). A mental status examination indicated that Claimant was depressed, and that his recent memory was impaired, but results were otherwise normal. (R. 1300). At an appointment the following month on August 21, Claimant reported continued abstinence from drugs. (R. 1302). He was somewhat anxious and depressed, but mental status examination results were otherwise normal. *Id*.

On September 7, 2017, Claimant saw Dr. Abriola for follow-up. (R. 1365). He had completed chemotherapy and reported feeling improved overall with the end of chemotherapy but was having some daytime fatigue. *Id*. His HIV remained asymptomatic. (R. 1367).

Claimant saw Ms. Harris for therapy again on September 19, 2017. He reported that he had been struggling with his mood, and Ms. Harris recommended that he go for walks or volunteer. (R. 1392). A mental status examination showed lethargy due to fatigue and a depressed mood, but his memory, concentration, judgment, and insight were intact. *Id*.

On December 7, 2017, Claimant returned to the emergency department at Hartford Hospital for a psychiatric evaluation after he threw his brother's stereo because he thought it was too loud. (R. 1405). His family reported that his behavior had been very unpredictable. *Id.* Claimant reported that his doctor had discontinued his Ativan for anxiety, and that he was frustrated by not having his antianxiety medication. *Id.* He denied drug or alcohol use. *Id.* When a nurse attempted to give him Atarax, he became agitated and screamed that he wanted Ativan. (R. 1413). Toxicology screens were negative. (R. 1414).

Claimant went to the emergency department at Hartford Hospital on December 22, 2017 complaining of having chest pain for one week. (R. 1432). He felt that he was having more panic attacks triggering chest discomfort since being taken off Ativan. *Id.* Claimant became belligerent and abusive toward the hospital staff and had to be removed by security and put in restraints. (R. 1434, 1439). Claimant sustained a nasal fracture as a result of his encounter with security. (R. 1441-42, 1448). Claimant was given multiple doses of Ativan as well as Haldol in an attempt to calm his outburst. (R. 1444).

### B. Claimant's Initial Hearing Testimony

At the first hearing on September 26, 2017, Claimant testified that he was 6' tall and weighed 236 pounds. (R. 88). He graduated from the University of Connecticut with a bachelor's degree in urban psychology. (R. 92). He testified that he lives with his parents and does not have a driver's license because he gets "dizzy." (R. 90-91). Claimant wore a mask to the hearing and reported that he does not like to take the bus or be around crowds because his low white blood cell count

causes him to be prone to infection. (R. 91-92). He had prior employment experience as a front desk clerk and night auditor for a hotel, a head concierge for an apartment building, a live-in caretaker, a visiting caretaker, a leasing agent, and a case manager. (R. 92-97, 107, 108).

Claimant testified to stopping work in 2016 because he could not focus on his work and did not have the "mental capacity" to do it. (R. 97, 118). Contrary to Claimant's report, Ms. Higgins' treatment notes indicated that in 2016 Claimant lost his job at a leasing agency because he did not receive a promotion and lost his next job that year as a caretaker at a farm after he relapsed on crack cocaine and alcohol. (R. 1362) Claimant testified to taking various prescription medications, including Wellbutrin XR 150 milligrams, Gabapentin, Lexapro 20 milligrams, Topamax 100 milligrams, and Ativan. (R. 98).

Claimant testified his sister found him ready to commit suicide by overdosing in June of 2017. (R. 100). He also testified he did not have a substance abuse problem, because he only used drugs to help him cope with pain; "I don't have a problem with drugs." (R. 101, 111).

Claimant testified that he did chores at home, made meals, and did some gardening, although that tires him out. (R. 103, 116). He also cared for his dog with help from his mother. (R. 105).

Claimant testified that he lived with his cousin in Nevada in 2014 or 2015 but could not stay there due to anxiety attacks that he described as a "wave" or a "tsunami." (R. 106).

### C.      Vocational Expert's First Hearing Testimony

At the first hearing on September 26, 2017 Dennis King testified as a vocational expert. (R. 119-24).  He testified that Claimant's past work was as a front desk clerk and night auditor, DOT 238.367-038, with an SVP of 4,  and DOT 210.382-054, with an SVP of 5; concierge, DOT 238.367-030, with an SVP of 4; resident care aide, DOT 355.377-018, with an SVP of 6; and home health aide, DOT 354.377-014, with an SVP of 3.  (R. 120-21).

For a first hypothetical, ALJ Borré asked the vocational expert to assume a person who had no exertional limitations but was limited to performing simple and repetitive tasks in an environment that did not call for interaction with the public, only occasional interaction with coworkers and supervisors, and no climbing of ladders, ropes, or scaffolds, or hazards such as unprotected machinery or unprotected heights, with no exposure to concentrated dusts, gas, and fumes and only occasional temperature extremes.  (R. 121).  When asked what work such a person could do, the expert testified that such limitations would rule out all of Claimant's past work but such an individual could perform the job of order picker, DOT 922.687-058, medium, with an SVP of 2, with 1,807,200 jobs in the national economy; prep-cook, DOT 317.687-010, medium, with an SVP of 2, with 873,900 jobs in the national economy; and dish washer, DOT 318.687-010, with a SVP of 2, medium, with 540,200 jobs in the national economy.  (R. 122).

Next, the ALJ asked the expert to apply the factors from the first hypothetical except limit the individual to the light, not medium, level. (R. 122-23).  The expert testified that such an individual could perform the job of garment sorter, DOT 222.687-014, but that the numbers would be reduced to about 54,700 in the national

economy. (R. 123). He testified further that such an individual could perform the work of a mail sorter, DOT 209.687-026, with an SVP of 2, with 98,900 jobs in the national economy; and laundry worker, DOT 302.685-010, with an SVP of 2, with 231,200 jobs in the national economy. (R. 123).

ALJ Borré posed a third hypothetical with the same limitations as those contained in the second hypothetical but with the additional restriction of being unable to interact appropriately with coworkers approximately 10 percent of the time. (R. 123). The expert testified that no jobs would be available to an individual with that additional limitation. (R. 123-24). ALJ Borré posed another hypothetical with the same limitations as those contained in the second hypothetical but with the additional restriction of being off-task 15% of the work day due to either anxiety or physical issues that would cause that individual to have to leave the work area. (R. 124). The expert testified that no jobs would be available to an individual with that additional limitation. (R. 124). Finally, ALJ Borré posed another hypothetical with the same limitations as those contained in the second hypothetical but with the additional restriction of being out of work consistently two times a month. (R. 124). The expert testified that no jobs would be available to an individual with that additional limitation. (R. 124).

### D.    Medical Expert's Second Hearing Testimony

At the second hearing on January 23, 2018 Dr. Billings Fuess, a psychologist, testified as a medical expert. (R. 52-74). Dr. Fuess first noted that Claimant had a history of bipolar disorder, major depression, generalized anxiety, cannabis dependence, and cocaine abuse. (R. 57). Dr. Fuess noted that Claimant

went to the emergency room on one occasion in 2011 with suicidal ideation. (R. 58). In 2014, Dr. Fuess noted, Dr. Lago examined Claimant and found his cognitive status to be "excellent," although he had mild to moderate depression, and his substance abuse disorder was in remission. (R. 58-59). He also noted that later, in December 2016, Claimant was examined and reported that he was "smoking $100 of cocaine per day." (R. 59). After reviewing several other examinations of Claimant from 2015 to 2017, ALJ Borré asked Dr. Fuess if Claimant's diagnoses in total encompassed "bipolar disorder, major depressive disorder, general anxiety, and PTSD, as well as substance abuse," and Dr. Fuess agreed that they did. *Id.*

Next, ALJ Borré asked Dr. Fuess about Claimant's functional limitations. Dr Fuess opined that Claimant had mild or slight independent or individual limitations. (R. 62). Dr. Fuess also opined that if Claimant takes his prescribed medications and abstains from substance abuse, he has a mild limitation regarding social interactions generally, with moderate limitations concerning concentration, persistence and pace. (R. 62-63). As far as adapting to changing circumstances, Dr. Fuess opined that Claimant has a moderate limitation. (R. 63). Overall, Dr. Fuess did not think that Claimant, when abstaining from substance abuse, met a listing, specifically 12.04. 12.06, and 12.15 for trauma related disorders, but did note Claimant's limitations in "his ability to manage excessive stress, high-demand, frequent changes in assignments, . . . and in being able to manage with, again, frequent high-stress types of job situations." (R. 64). Dr. Fuess opined that Claimant would be "capable of psychologically functioning" in "[r]outine, simple, repetitive types of tasks." (R. 64-65). ALJ Borré asked Dr. Fuess if Claimant could

interact with the public in a job and Dr. Fuess opined that "if he's on medications, properly medicated, I think he would be capable of infrequent interaction with the public." (R. 65). He also opined that Claimant could interact properly with coworkers with only a mild limitation if he was "on medication and abstaining from substance abuse." (R. 65-66). When ALJ Borré asked if Claimant's alcohol and substance abuse "contribute to his limitations," Dr. Fuess opined that "crack cocaine and cocaine were the primary substances that would lead to agitation and behavioral change." (R. 66). ALJ Borré again asked Dr. Fuess if Claimant's substance abuse would increase his limitations, Dr. Fuess said "I think so" and noted that doctors had advised Claimant to "abstain from drugs in order to maintain stable mood" and that when he had suicidal ideation, it was when Claimant was "using crack cocaine and marijuana daily." (R. 67).

Claimant's counsel asked Dr. Fuess if Claimant "would have any times of off-task behavior if he were to be in a job setting?" (R. 67-68). Dr. Fuess answered that if the job entailed "simple, routine, well-learned, and repetitive tasks" there would be a "low likelihood." (R. 68). "If he was properly medicated, none. Very low." *Id.* Claimant's counsel pointed out that one medical provider rated Claimant's "ability to perform work activity on a sustained basis eight hours per day, five days per week" was rated as a "four," or "serious problem," but Dr. Feuss stated "that statement is not consistent with the treatment notes." *Id.* When asked whether, if for a legitimate medical reason, such as chemotherapy, Claimant having to eliminate his psychiatric drugs would increase his limitations, Dr. Feuss said yes, "without his medications . . . he would have more impairments. Maintaining

attention, concentration.  Very limited task complexity.  Moderate to marked [limitations]."  (R. 72-73).

ALJ Borré asked Dr. Feuss if there was evidence in the record to support Claimant's alleged start of disability date of March 25, 2011, and Dr. Feuss responded that there was.  (R. 73).

E.    Vocational Expert's Second Hearing Testimony

ALJ Borré first made a finding that Claimant was unable to perform his past relevant work due to his limitations.  (R. 75).  ALJ Borré then asked vocational expert Dr. Sachs to assume a person who had no exertional limitations but was limited to performing simple and repetitive tasks in an environment that did not call for interaction with the public, no strict production quotas, only occasional interaction with coworkers and supervisors, and no climbing of ladders, ropes, or scaffolds, or other hazards, and no exposure to concentrated dusts, gas, and fumes and only occasional temperature extremes.  When asked what "other" work such a person could do, Dr. Sachs stated that the person could be a "hand packer at the unskilled, medium level," DOT 920.587-018, with 109,000 jobs in the national economy; production worker, unskilled, medium level, DOT 762.684-026, with 60,000 jobs in the national economy; and production inspector, unskilled, medium level, DOT 369.687-014, with 15,000 jobs in the national economy.

ALJ Borré asked Dr. Sachs to assume the same restrictions but restrict the hypothetical person to only "light" jobs.  Dr. Sachs responded that this person could be a hand packer at the unskilled, light level," DOT 920.687-018, with 210,000 jobs in the national economy; production worker, unskilled, light level, DOT

723.684-018, with 131,000 jobs in the national economy; and production inspector, unskilled, light level, DOT 762.687-014, with 79,000 jobs in the national economy.

ALJ Borré posed another hypothetical to Dr. Sachs with the same limitations but with the additional restriction of being off-task 15 percent of the work day due to either anxiety or physical issues that would cause that individual to have to leave the work area at frequent and unpredictable intervals. (R. 77). Dr. Sachs testified that no jobs would be available to an individual with that additional limitation at any exertion level. *Id.* ALJ Borré posed a final hypothetical with the same limitations as those contained in the first hypothetical but with the additional restriction of being unable to interact appropriately with coworkers approximately 10 percent of the time. *Id.* Dr. Sachs testified that no jobs would be available to an individual with that additional limitation at any exertion level. *Id.* Dr. Sachs gave the same answer to a question about a worker who was out of work infrequently but consistently. *Id.*

### F.      Claimant's Second Hearing Testimony

Claimant, when asked if he had anything else to discuss, stated that when he goes to the doctor and when he used to go to work, he would groom himself appropriately. He also stated that he can not work because he has "social anxiety" that makes him unable to focus on his work, and loss of concentration that makes him unable to work. (R. 78). He also said that he finally realizes that he has mental health problems such as bipolar disorder that he needs treatment for. (R. 79). He also noted that completing college made him so "mentally exhausted" that it made him sick. *Id.*

## II.        Procedural History

On September 15, 2014, Claimant applied for SSDI and SSI benefits.  (R. 10).
Claimant's applications were denied initially on December 12, 2014 and upon
reconsideration on March 31, 2016.  *Id.*  On May 13, 2016, Claimant requested a
hearing.  *Id.*  ALJ Borré heard the case on September 26, 2017 and January 23,
2018.  (R. 81, 47).  On February 14, 2018, ALJ Borré issued a decision finding that
Claimant was not disabled within the meaning of the Social Security Act.  (R. 7-30).
On May 10, 2018, the Appeals Council denied Claimant's request for review making
ALJ Borré's decision final.  (R. 1-6).  Claimant commenced this action on July 3,
2018.

### A.        The ALJ's Decision

ALJ Borré made several findings in his decision on February 14, 2018 which
are subject to review by this Court.  ALJ Borré determined that Claimant has not
engaged in substantial gainful activity for several 12-month periods since March
25, 2011, the alleged onset date, and has not engaged in substantial gainful activity
at all since April 1, 2016.  (R. 13).  He found that the Claimant suffers from the
following severe impairments: bipolar disorder, post-traumatic stress disorder,
major depressive disorder, polysubstance abuse, and Hodgkin's lymphoma.  *Id.*
ALJ Borré found that these impairments significantly limit Claimant's ability to
perform basic work activities.  *Id.*  ALJ Borré also found that Claimant has HIV and
mild obstructive sleep apnea, but these conditions did not represent "more than
minimal, if any, limitations to his functional capacity," and were "nonsevere
impairment[s]."  (R. 14).  The ALJ found that these impairments were non-severe

because Claimant's HIV was asymptomatic, and Claimant had not received "significant care" for his sleep apnea. *Id.*

ALJ Borré concluded that Claimant's impairments, including the substance abuse disorders, met the severity of sections 12.04, 12.06, and 12.15 in Appendix 1. (R. 14). First, ALJ Borré found that Claimant's impairments satisfied the "paragraph A" criteria because Claimant has a depressed mood, sleep disturbance, psychomotor agitation, decreased energy, difficulty concentrating or thinking, thoughts of death or suicide, and irritability. *id.* Second, ALJ Borré found that Claimant satisfied the "paragraph B" criteria because Claimant has a "marked" limitation with regard to concentrating, persisting, or maintaining pace, and has a marked limitation with regard to adapting or managing himself. (R. 15).

ALJ Borré also found that if Claimant "stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments. (R. 19). However, ALJ Borré found that if Claimant stopped the substance abuse, he would not meet the severity of sections 12.04, 12.06, and 12.15 in Appendix 1. *Id.* This is because during periods of sustained sobriety Claimant was capable of engaging in work activity, demonstrating significant ability to understand, remember and apply information. (R. 20). He also demonstrated significant ability to interact with others. *Id.* Claimant would have a "moderate" limitation, even if sober, in concentrating, persisting, or maintaining pace, but the ALJ found that when sober Claimant had no noted impairment to his attention or concentration. *Id.*

ALJ Borré ruled that if the Claimant stopped the substance abuse, he would have a residual functional capacity ("RFC") "to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except "no climbing of ladders, ropes or scaffolding, no exposure to unprotected hazards, occasional exposure to temperature extremes, and no concentrated exposure to dust, fumes and gases." *Id.* Additionally, he could perform only simple, routine tasks, tolerate no interaction with the public, occasional interaction with co-workers and supervisors, occasional changes in work routine and perform no work involving strict production quotas. (R. 21).

The ALJ considered the various opinion evidence contained in the record and came to the following conclusions. First, ALJ Borré afforded great weight to Dr. Fuess's opinion at Claimant's second hearing that during periods of active substance abuse Claimant would experience increased limitations in his functioning, particularly regarding his ability to maintain a stable mood. Dr. Fuess had also opined that without medication and during substance abuse, Claimant "would experience moderate to marked impairments in his ability [to] maintain attention and concentration and adapt and mange himself, and moderate limitations in his ability to maintain social interactions and understand, remember and apply information." (R. 18). ALJ Borré also gave great weight to the opinion of Claimant's treating physician Dr. Abriola, who opined that during periods of active substance abuse, Claimant would experience some significant limitations to his functional capacity, while during periods of sobriety, he would demonstrate improvement in in his mental status, an ability to return to work activity. (R. 19).

ALJ Borré also gave great weight to the opinion of Claimant's treating physician Dr. Lago, who endorsed a history of depression, but noted that following treatment, Claimant's mood improved, and he was able to return to work.  (R. 26).  Dr. Lago's opinions were generally consistent with those of Dr. Fuess.  *Id.*

Next, the ALJ gave partial weight to the opinion of David Schroeder, Ph.D., who treated Claimant in mid-2011.  *Id.*  Dr. Schroeder opined that during a period of active substance abuse Claimant experienced increased limitations to his functional capacity, which was generally consistent with Dr. Fuess' opinion.  (R. 19).

ALJ Borré gave little weight to the opinions of non-examining state agency consultants, who found Claimant's mental health impairments to be non-severe, because the opinions were inconsistent with the medical evidence, and the opinions were offered before some of the more recent medial history, "showing ongoing signs and symptoms of the claimant's mental health impairments, supporting a determination that they are severe determinable impairments."  (R. 26-27).

After making the RFC determination, ALJ Borré found that even if he stopped the substance abuse, Claimant would be unable to perform any past relevant work as a front desk clerk, night auditor, concierge, resident care aide, or home health aide. (R. 28).  In considering the Claimant's "age, education, work experience, and residual functional capacity," ALJ Borré determined that if he stopped abusing controlled substances, there existed a significant number of jobs in the national economy that Claimant could perform.  (R. 29).  At the hearing, ALJ Borré asked

the vocational expert a hypothetical of the possible jobs for a person with Claimant's "age, education, work experience" who is limited to the light exertion level and Claimant's residual functional capacity. *Id.* The vocational expert testified that jobs available to the hypothetical person included a hand packager, a production worker, and a production inspector. *Id.*

ALJ Borré determined that "[b]ased on the vocational expert's testimony, the undersigned concludes that, if the claimant stopped the substance use, he would be capable of making a successful adjustment to work that exists in significant numbers in the national economy. Because of this, ALJ Borré determined that Claimant's "substance abuse disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if stopped the substance abuse. Because the substance abuse disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision." (R. 30).

### III.    Legal Standard

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.§ 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, [are] conclusive . . . ." 42 U.S.C. § 405(g); *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)). Accordingly, the court may not make a *de novo*

determination of whether a plaintiff is disabled in reviewing a denial of disability benefits.  *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and whether the decision is supported by substantial evidence.  *Johnson v. Bowen,* 817 F.2d 983, 985 (2d Cir. 1987).  Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence.  *Berry v. Schweiker,* 675 F.2d 464, 467 (2d Cir. 1982).  Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position*.  Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982).

Thus, "[i]n reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (citing 42 U.S.C. § 405(g)).  "'Substantial evidence' is 'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").  "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'"  *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams*

*ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir. 1987)).

The Social Security Act establishes that benefits are payable to individuals who have a disability. 42 U.S.C. § 423(a)(1). "The term 'disability' means . . . [an] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . ." 42 U.S.C. § 423(d)(1). An "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment must be one which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

In order to determine whether a claimant is disabled within the meaning of the SSA, the ALJ must follow a five-step evaluation process as promulgated by the Commissioner:

1. First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity ("Step One").

2. If she is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits her physical or mental ability to do basic work activities ("Step Two").

3. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations ("Step Three").

4. If the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the Residual Functional Capacity ("RFC") to perform her past work ("Step Four").

5.     Finally, if the claimant is unable to perform her past work, the [Commissioner] then determines whether there is other work which the claimant could perform ("Step Five").

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (citing 20 C.F.R. § 404.1520).

A claimant's residual functional capacity ("RFC") is determined by the ALJ's assessment of the claimant's capacity to work, taking into consideration the extent to which the claimant's impairment(s) and related symptoms limit what the claimant can do in a work setting. 20 C.F.R. §§ 404.1545; 404.1546. A claimant's RFC is "what an individual can still do despite his or her limitations." SSR 96–8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims ("SSR 96–8p"), 1996 WL 374184, at *2 (S.S.A. July 2, 1996); *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p). "Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis."[5] SSR 96–8p, 1996 WL 374184, at *2.

"A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule." *Id.*; *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (defining RFC as "an individual's ability to do sustained work-related

---

[5] The determination of whether such work exists in the national economy is made without regard to: 1) "whether such work exists in the immediate area in which [the claimant] lives;" 2) "whether a specific job vacancy exists for [the claimant];" or 3) "whether [the claimant] would be hired if he applied for work." *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

physical and mental activities in a work setting on a regular and continued basis")
(quoting SSR 96–8p, 1996 WL 374184, at *1).

RFC is a comprehensive "assessment based upon all of the relevant
evidence . . . [which evaluates a claimant's] ability to meet certain demands of jobs,
such as physical demands, mental demands, sensory requirements, and other
functions." 20 C.F.R. § 220.120(a). An ALJ must consider both a claimant's severe
impairments and non-severe impairments in determining his/her RFC. 20 C.F.R. §
416.945(a)(2); *De Leon v. Sec'y of Health & Human Servs.*, 734 F.2d 930, 937 (2d Cir.
1984).

"At Step Five, the Commissioner must determine that significant numbers
of jobs exist in the national economy that the claimant can perform." *McIntyre v.
Colvin*, 758 F.3d 146, 151 (2d Cir. 2014). "[W]ork which exists in the national
economy means work which exists in significant numbers either in the region
where such individual lives or in several regions of the country." 42 U.S.C. §
423(d)(2)(A). Such work need not exist in the region where the claimant lives. C.F.R.
404-1566(a)(1). While the claimant has the general burden of proving his or her
disability within the meaning of the Act, at Step Five, the burden shifts to the
Commissioner to show that there is other work that the claimant can perform.
*McIntyre*, 758 F.3d at 150 (citing *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 445 (2d
Cir. 2012) (per curiam)).

Congress has determined that claimants are not entitled to disability benefits
if alcohol or drug abuse is a contributing factor material to their disability. 42 U.S.C.

§ 423(d)(2)(c). On March 29, 1996, the Act was amended by Section 105(b)(1)(l),

Public Law No. 104-121, 110 Stat. 847 (1996) as follows:

> [a]n individual shall not be considered to be disabled for purposes of this title if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled.

42 U.S.C. § 423(d)(2)(C). Substance abuse is a material factor if the individual would

be found not disabled if he stopped abusing substances. 20 C.F.R. §§ 404.1535,

416.935. In making this determination, the adjudicator must consider which of the

claimant's current physical and mental impairments would remain if he stopped

using drugs and alcohol, and then, whether these remaining limitations would be

disabling. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). In the Second Circuit the

claimant, not the Commissioner, bears the burden of proving that drug or alcohol

abuse was not a contributing factor material to the disability. *Cage v. Comm'r of*

*Social Security,* 692 F.3d 118, 125 (2012).

## IV.    Analysis

Claimant moves for reversal or remand on the grounds that the ALJ gave too

much weight to the evidence of Claimant's substance abuse, which, in the face of

Claimant's undisputed disability, caused the ALJ to improperly deny Claimant

disability benefits. In response, the Commissioner argues that the ALJ's proper

finding that Claimant's substance abuse was a contributing factor to his disability

is supported by substantial evidence. The Court agrees with the Commissioner.

There is substantial evidence in the record to support the ALJ's finding that

Claimant's substance abuse was a contributing factor material to Claimant's

disability, and Claimant has failed to sustain his burden of producing evidence

sufficient to demonstrate that his substance abuse was not material to his disability.

**A.     There was Substantial Evidence that, Absent Substance Abuse, Claimant Retained the Ability to Perform a Reduced Range of Light Work**

Claimant's argument that the ALJ erred by not awarding disability benefits is incorrect and unsupported by the evidence.   The ALJ properly discussed substantial evidence supporting his determinations.

Consistent with 20 C.F.R. §§ 404.1535, 416.935 and Social Security Ruling (SSR) 13-2p, after determining that Claimant's severe impairments included polysubstance abuse and that Claimant's mental impairments met the criteria for Listings 12.04 (depressive, bipolar and related disorders), 12.06 (anxiety and obsessive-compulsive disorders), and 12.15 (trauma- and stressor-related disorders), the ALJ evaluated whether Claimant would be disabled absent substance use.  *See* (R. 19-30); 20 C.F.R. §§ 404.1535(a), 416.935(a) ("If we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability."); SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013).  The ALJ discharged this duty and, based on the medical evidence in the record, correctly determined that absent substance use, Claimant would retain the capacity for a reduced range of light work, and that therefore the Claimant was not disabled.  (R. 30).  Substantial evidence supports the ALJ's determination, and it must, therefore, be affirmed.

**1. Substantial Evidence from Periods of Abstinence Supports the ALJ's Determination that Substance Abuse was Material to Claimant's Mental Impairments Meeting the Listings**

The ALJ cited substantial evidence in support of his determination that, absent substance use, Claimant would be able to perform a reduced range of light work. (R. 21). Regarding Claimant's mental capacity, the ALJ gave great weight to the opinion of Dr. Billings Fuess. (R. 25-26). Dr. Fuess, a psychological expert who testified at Claimant's January 2018 hearing after reviewing Claimant's medical records, opined that Claimant's alcohol and substance use contributed to his mental limitations, as evidenced by relapses documented in the medical record, noting that periods of cocaine and crack cocaine use led to agitation and behavioral changes. (R. 66); 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3) (generally, the more a source provides evidence in support of an opinion, the more weight will be given to that opinion). Dr. Fuess opined that during periods of remission from substance use, Claimant had no more than mild limitations in understanding, remembering, and applying information. (R. 62). He opined that Claimant, when not abusing substances, had no more than a mild limitation in interacting with others, noting his cooperation at the consultative examinations. (R. 62). Dr. Fuess opined that Claimant could perform simple, routine, repetitive-type tasks; that if Claimant was taking his medication, he could interact infrequently with the public; and that if he was abstaining from substances and taking medication, he could interact appropriately with coworkers. (R. 65-66)..

The ALJ properly afforded great weight to Dr. Fuess's opinion. The ALJ noted that Dr. Fuess was an acceptable medical source who was also an expert in Social Security disability evaluation. (R. 26) (citing 20 C.F.R. §§ 404.1527, 416.927);

*see* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) (ALJ will consider a medical source's specialization when weighing medical opinion). He further explained that Dr. Fuess's opinion was generally consistent with the totality of the record, which showed improvement and stability in Claimant's mental impairments when Claimant was compliant with treatment recommendations and abstained from illicit substances, and that he was able to engage in work activity during such periods. (R. 26) (citing R. 455-62 (showing earnings of $4234.46 in 2012; $17,948.87 in 2013, $3497.48 in 2014; $4458.00 in 2015; and $7822.98 in 2016)).

The medical records the ALJ referred to as supportive of Dr. Fuess's opinions generally reflect stable psychiatric functioning and notations from his providers that he was doing well during periods of abstinence from substance abuse, and that his cognitive functioning was intact during such periods. (R. 26) (citing R. 825 (Dec. 2011 - "doing generally well"); R. 827 (Nov. 2011 – upset mood, but alert and fully oriented, with fair insight and judgment); R. 883 (May 2012 – "reports feeling better mentally. 'Learning to control it.' Anxiety is a problem. . . . Wants to stay off meds until November 2012."); R. 934-37 (Nov. 2014 – Dr. Lago's mental status examination noting that Claimant had not used drugs for two months, showing that Claimant's cognition was excellent, he was fully oriented, he could follow simple commands and instructions, and was insightful, attentive, and very well focused); R. 979 (Nov. 2015 – Claimant reported that he was doing well and was medication compliant, with no panic attacks or substance abuse, and was working a part-time job); R. 983 (Feb. 2016 – Claimant reported he had a new job as

a case manager, had not used any drugs or alcohol, had good sleep, appetite, and energy; mental status examination results were within normal limits)).

The ALJ also explained that the medical records were consistent with Dr. Fuess's assessment that Claimant at times engaged in substance abuse and failed to follow treatment recommendations, which negatively impacted his ability to function. (R. 26) (citing R. 892 (Oct. 2012 – "He remains off of medications for depression and bipolar disorder."); R. 899 (same); R. 908 (March 2014 – "He remains off medications for depression and bipolar disorder. His current somewhat paranoid ideation is concerning. The use of cocaine is also concerning. He was cautioned against further use of cocaine.")). The ALJ discussed that Claimant experienced an increase in symptoms during a substance abuse relapse in early 2014, (R. 16) (citing R. 750, 908, 910), but that once he restarted his medications and resumed mental health treatment, he was able to move to Nevada for several months, and his symptoms improved. (R. 16) (citing R. 950, 979).

The ALJ further noted that throughout much of 2015 and 2016, Claimant was compliant with his medication and sustained sobriety, and during this time he was capable of engaging in work activities, (R. 16) (citing R. 979, 983), though at times in 2015, he presented for emergency care in the context of active substance use or cocaine binges. (R. 16) (citing R. 954, 987, 1362). Then, in April 2016, Claimant began a prolonged period of substance use that resulted in the need for emergency care, intensive outpatient treatment, and inpatient hospitalization. (R. 16) (citing R. 1131-32, 1332, 1334). Further emergency department visits and hospitalizations followed in 2017, coinciding with his use of illicit substances and/or apparent

narcotic seeking behavior.  (R. 16) (citing R. 1016, 1171, 1175, 1182).  He continued to report intermittent drug and alcohol use and overuse of prescription medication in 2017, and additional hospitalizations resulted as a consequence.  (R. 17) (citing R. 1228, 1345-47, 1349-50).  However, in August 2017, following a reported two-month period of abstinence from drugs and alcohol, Claimant's cognition was intact and his mental status examination results were within normal limits, aside from a blunted affect and a somewhat anxious mood.  (R. 17) (citing R. 1302).

In citing and discussing this evidence, the ALJ appropriately considered Dr. Fuess's opinion's consistency with the medical record.  20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) (generally, the more consistent an opinion is with the evidence of record, the more weight the opinion will be given).   The ALJ, therefore, appropriately considered the regulatory factors when weighing Dr. Fuess's opinion and cited substantial evidence in support of his analysis.

The ALJ also properly considered treating physician Dr. Abriola's opinions regarding Claimant's functioning.  He discussed Dr. Abriola's June 8, 2011 opinion, noting that it stated that Claimant, after having abstained from substance abuse, had some problems applying appropriate coping skills, handling frustration, interacting appropriately with others in a work environment, and maintaining focus and concentration, but in most functional areas, he opined that Claimant had slight or no difficulties.  (R. 18) (citing R. 745- 6.   He also discussed Dr. Abriola's November 2011 opinion, in which Dr. Abriola opined that Claimant had serious problems using coping skills and handling frustration, which had followed  a period of substance abuse.  (R. 18) (citing R. 821).  Finally, he considered Dr. Abriola's

February 2016 opinion, in which he stated that Plaintiff had no physical limitations that would affect his ability to sit, stand, walk, lift, carry, or bend, but opined that Claimant's mood disorder would cause Claimant difficulty concentrating, remembering instructions, and handling work pressures. (R. 18) (citing R. 986). The ALJ gave these opinions great weight. (R. 19). He noted that the opinion authored by Dr. Abriola in November 2011 stating that Claimant had some obvious and some serious problems in certain functional areas were authored during a period of active substance abuse and demonstrated that Claimant would experience some significant limitations during such periods, as evidenced by contemporaneous treatment notes. (R. 19) (citing R. 670-72); (R. 16) (citing R. 803-07; *see also* R. 721, 830, 834). The ALJ appropriately weighed Dr. Abriola's 2011 opinions, and they provide further substantial evidence in support of the ALJ's determination that substance abuse was material to the finding of disability. *See* 20 C.F.R. §§ 404.1527(c)(2), (3), (4), 416.927(c)(2), (3), (4).

With respect to Dr. Abriola's 2016 opinion, in which he stated that Claimant had no limitations in sitting, standing, walking, lifting, carrying, or bending, but that his mood disorder would cause some difficulty concentrating, remembering instructions, and handling work pressures, the ALJ noted that this opinion was authored prior to Claimant's cancer diagnosis and treatment, but was issued during a period of sobriety. (R. 19) (citing R. 986). The ALJ noted that the opinion regarding Claimant's mental limitations was generally consistent with Dr. Fuess's opinion that, absent substance use, Claimant had moderate limitations in his ability to concentrate, persist, and maintain pace and to understand, remember, and apply

information.  (R. 19) (citing R. 62-63, 986); 20 C.F.R. §§ 404.1517(c)(3), 416.927(c)(3).

Accordingly, the ALJ appropriately incorporated the mental limitations in Dr. Abriola's 2016 opinion into the RFC limiting Claimant to simple, routine tasks involving only occasional changes in work routine and no strict production quotas, with no interaction with the public and occasional interaction with supervisors and co-workers.  (R. 21, 25).

Similarly, the ALJ considered the opinion of treating psychologist Dr. Schroeder, who opined in June 2011 that Claimant had obvious or serious problems in the ability to maintain activities of daily living.  (R. 19) (citing R. 752-55).   As with Dr. Abriola's November 2011 opinion, the ALJ noted that Dr. Schroeder's opinion was authored during a period of active substance abuse. (R. 19) (citing R. 666-68, 803).   He further noted that the opinion was generally consistent with Dr. Fuess's opinion that Claimant experienced increased limitations during periods of substance abuse.  (R. 19); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4).  The ALJ also acknowledged that Dr. Schroeder was a treating source and that the opinion was within his area of specialty.   (R. 19); 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5).   Dr. Schroeder's opinion, too, supported the ALJ's determination that Claimant was disabled during periods of substance abuse.

In addition to the medical opinion evidence and the medical records cited above, the ALJ also noted that Claimant himself had reported during periods of sobriety that he could independently perform his daily activities, perform household chores, do yard work, babysit for family members, drive, jog, bike, and go for long walks in the woods.  (R. 25) (citing R. 557 ("I stay busy keeping up the

house and helping family and friends. . . . I help my family by volunteering [to] stay with their kids if they need the help."), R. 559-62, 563 ("can walk many miles up to 10 miles before I need to rest. I love walking").

Thus, the ALJ described evidence of Claimant's mental functioning during periods of sobriety that supported his determination that Claimant's mental impairments were not disabling during such periods. Claimant's repeated periods of work activity during the relevant period are perhaps the most compelling evidence that during periods of sobriety, he retained the capacity to work. (R. 455-62) (showing earnings throughout relevant period); R. 893 (Dec. 2012- reported working two jobs); R. 910 (March 2014 – reported that he had been fired from his job two weeks after relapsing on crack cocaine, but had obtained a new job to start in April); R. 914 (July 2014 – reported that he was working); R. 983 (Feb. 2016 – reported that he was working). Other evidence in the record not specifically noted includes Claimant's own statement to Ms. Higgins that he lost a job he liked in 2016 after he relapsed on crack cocaine and alcohol. Claimant has cited no evidence to contradict the ALJ's determination.

### 2.  Substantial Evidence Supports the ALJ's Physical RFC Determination

With respect to Claimant's physical capacity, the ALJ acknowledged Claimant's allegations that his cancer treatment in 2017 had caused ongoing symptoms of fatigue and body pain. (R. 24) (citing R.1102, 1104, 1111, 1325); (R. 25) (citing R. 99, 113). However, the ALJ explained that the record demonstrated that Claimant's cancer was treated successfully, and that examination findings and diagnostic testing did not establish the existence of significant loss of functional

capacity. (R. 24) (citing R. 1322 (noted that a PET was scan negative, indicating remission); (R. 1294, 1389-90). But, because of the ongoing fatigue and body pain, the ALJ, instead of imposing no physical limitations in the RFC, conservatively limited Claimant to light work with postural and environmental limitations. (R. 19, 21). The ALJ explained that the record did not contain diagnostic tests or examination findings establishing significant loss of functional capacity related to Claimant's successful cancer treatment but based on Claimant's allegations regarding the effects of his chemotherapy, he limited Claimant to a reduced range of light work. (R. 25); *see also, e.g.*, (R. 1318) (June 2017 review of systems in which Claimant reported intermittent fatigue); (R. 1325) (July 2017 appointment note indicating that Claimant was feeling rundown and achy during chemotherapy). The ALJ, therefore, adequately explained the basis for the physical RFC finding, and Claimant has offered no evidence to the contrary. *See Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (the Commissioner need not provide evidence of the claimant's RFC).

It is Claimant's burden to provide evidence establishing that he was disabled, and that his substance abuse was not material to his disability. Claimant failed to do so, and substantial evidence supports the ALJ's determination that, absent substance abuse, Claimant was capable of the level of work activity described in the RFC, and that substance abuse was material to his disability, resulting in a finding of no disability under the Social Security Act.

## V.    Conclusion

For the foregoing reasons, Claimant's Motion for Order Reversing the Decision of the Commissioner is DENIED and the Commissioner's Motion for Order

Affirming the Commissioner's Decision is GRANTED.  The Clerk is directed to close

this case.

**IT IS SO ORDERED.**

*Vanessa Lynne Bryant*    Vanessa Bryant
2019.09.09 15:36:54
-04'00'

**Hon. Vanessa L. Bryant**
**United States District Judge**

**Dated at Hartford, Connecticut: September 9, 2019.**